UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BRANDON TERRELL RAMSEY,
      Petitioner,

vs.                                Case No.:  5:20cv302/TKW/EMT

RICKY D. DIXON,
      Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Petitioner Brandon Terrell Ramsey (Ramsey) filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 10).  Respondent (the State) filed an answer and attached relevant portions of the state court record (ECF Nos. 17, 17-1 through 17-33).  Ramsey filed a reply and a motion for evidentiary hearing (ECF No. 25 at 5–46).[1]

---

[1] On January 26, 2022, the undersigned issued a Report and Recommendation (R & R) and indicated therein that Ramsey had been provided an opportunity to file a reply but had not done so as of January 26, 2022 (ECF No. 28 at 1 (referencing ECF Nos. 18, 19, 26)).  It was later discovered, however, that the clerk's office received a motion for appointment of counsel, motion for evidentiary hearing, and reply from Ramsey on October 25, 2021 (ECF No. 25).  The clerk's office docketed all three documents as one document, a Motion to Appoint Counsel (*id.*).  As grounds for seeking appointment of counsel Ramsey alleged he was unable to conduct legal research to complete his reply due to COVID-19 lockdowns at the prison (*id.* at 1–2).  On October 26, 2021, the court denied Ramsey's motion for appointment of counsel but provided him additional time, until November 29, 2021, to file a reply (ECF No. 26).  Later that day, the clerk's office received a motion for extension of time from Ramsey, requesting a deadline of November 23, 2021, to file a reply (ECF No. 27).  The court terminated the motion as moot, since the court had already extended the reply deadline to November 29, 2021 (*see id.*).  On December 9, 2021, the clerk's office notified the undersigned that Ramsey had not filed a reply.  As noted *supra*, the

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b). After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Ramsey is not entitled to habeas relief.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 17-1 through 17-33).[2] Ramsey was charged in the Circuit Court in and for Washington County, Florida, Case No. 2014-CF-83, with one count of Burglary of an Occupied Dwelling While Armed With a Firearm (Count I) and one count of Robbery With a Firearm (Count II) (ECF No. 17-4 at 69–

---

undersigned issued an R & R on January 26, 2022, inadvertently overlooking the reply received on October 25 and docketed as a Motion to Appoint Counsel. The district court thus vacated the R & R and remanded the case to the undersigned, with directions to "consider the argument in the reply [ECF No. 25 at 9–46] in the first instance and, if necessary, reconsider the disposition recommended in the R&R" (ECF No. 32 at 2). The undersigned has fully considered the arguments set forth in Ramsey's reply. Those arguments do not change the recommended disposition of this matter.

[2] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

70 (amended information)).  A jury trial was held on March 31, 2015 (ECF Nos. 17-8 and 17-9 (transcript of jury trial)).  The jury found Ramsey guilty as charged on both Counts (ECF No. 17-4 at 135 (verdict)).  On May 4, 2015, the court sentenced Ramsey as a prison releasee reoffender to concurrent terms of life in prison (ECF No. 17-1 at 7–13 (judgment); ECF No. 17-7 (transcript of sentencing)).

Ramsey appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D15-2570 (ECF No. 17-11 (Ramsey's initial brief); ECF No. 17-12 (State's answer brief); ECF No. 17-13 (Ramsey's reply brief)).  On November 17, 2016, the First DCA affirmed Ramsey's judgment and sentence per curiam without written opinion (ECF No. 17-14 at 2 (decision)).  *Ramsey v. State*, 203 So. 3d 161 (Fla. 1st DCA 2016) (Table).  The mandate issued December 5, 2016 (ECF No. 17-14 at 4 (mandate)).

On September 5, 2017, Ramsey filed a motion to correct illegal sentence in the state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (*see* ECF No. 17-16 at 11–22 (Rule 3.800(a) motion)).  The circuit court dismissed the motion on procedural grounds (ECF No. 17-16 at 23) (decision)).  Ramsey appealed the order to the First DCA, Case No. 1D17-5327 (ECF No. 17-16 at 24 (notice of appeal)).  On February 9, 2018, the First DCA affirmed the circuit court's order per curiam without written opinion (ECF No. 17-17 at 1–2 (decision)).

*Ramsey v. State*, 241 So. 3d 94 (Fla. 1st DCA 2018) (Table).  The mandate issued March 9, 2018 (ECF No. 17-17 at 4 (mandate)).

On January 17, 2018, Ramsey filed another Rule 3.800(a) motion in the state circuit court (ECF No. 17-19 at 10–16 (Rule 3.800(a) motion)).  The circuit court denied the Rule 3.800(a) motion on February 5, 2018 (ECF No. 17-19 at 17–18 (decision)).  Ramsey appealed the order to the First DCA, Case No. 1D18-946 (ECF No. 17-19 at 144 (notice of appeal)).  On April 16, 2018, the First DCA dismissed the appeal (ECF No. 17-20 (order)).

On June 11, 2018, Ramsey filed a third Rule 3.800(a) motion in the state circuit court (ECF No. 17-21 (Rule 3.800(a) motion)).  On August 21, 2018, the circuit court denied the Rule 3.800(a) motion as successive and frivolous (ECF No. 17-22 at 2–5 (decision)).

On July 27, 2018, Ramsey filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 17-23 (Rule 3.850 motion)).  Ramsey subsequently filed an amended Rule 3.850 motion, asserting four grounds for relief (ECF No. 17-26 at 13–38 (amended Rule 3.850 motion and attachments)).  The circuit court summarily denied Ground 3 and directed the State to respond to Ramsey's remaining claims (ECF No. 17-27 at 4–12 (non-final order)).  The State filed a response, and Ramsey replied (ECF No.

17-29 at 102 through 17-30 at 15 (State's response and Ramsey's reply)).  On July 11, 2019, the circuit court issued a final order denying Ramsey's amended Rule 3.850 motion (ECF No. 17-30 at 16–24 (decision)).  Ramsey appealed the decision to the First DCA, Case No. 1D19-2884 (ECF No. 17-32 (Ramsey's initial brief))). The First DCA affirmed the circuit court's order per curiam without written opinion on September 4, 2020 (ECF No. 17-33 at 2–3 (decision)).  *Ramsey v. State*, 303 So. 3d 521 (Fla. 1st DCA 2020) (Table).  The mandate issued October 2, 2020 (ECF No. 17-33 at 4 (mandate)).

Ramsey commenced this federal habeas action on November 2, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[3]  Justice O'Connor described the appropriate test:

---

[3] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia)

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

---

in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The

question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d).  *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).  Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.    RAMSEY'S CLAIMS

**A.    Ground One:    "Petitioner['s] Fourth, Fifth, and Fourteenth Amendment rights to the United States Constitution were violated when his statement and evidence was [sic] introduced and fruit of the poisonous tree tainted trial."**

Ramsey asserts defense counsel filed a motion to suppress a black t-shirt discovered and seized by a police officer while Ramsey was detained in the officer's patrol car (ECF No. 10 at 10–11, 31–33).  Ramsey asserts defense counsel also sought suppression of Ramsey's statement to an investigator at the Washington County Jail (Jail) two days after his arrest (*id.*).  Ramsey asserts the t-shirt was subject to suppression because the police officer did not have articulable reasonable suspicion that criminal activity had occurred and thus detained Ramsey in violation

of the Fourth Amendment (*id.*).  Ramsey asserts his statement to the investigator was subject to suppression, under the Fifth Amendment, because it was not freely and voluntary given due to Ramsey's being placed on "suicide watch" and suffering the effects of illegal drugs when he made the statement (*id.*).  Ramsey states the trial court denied the motion to suppress as to both issues, and the First DCA affirmed the trial court's decision on direct appeal (*id.*).  Ramsey argues the state courts' adjudication of Ground One was contrary to or an unreasonable application of clearly established federal law (*id.*).

The State concedes Ramsey exhausted both claims (i.e., suppression of the t-shirt and suppression of Ramsey's statement) by presenting them on direct appeal (ECF No. 17 at 13).  The State contends the First DCA's adjudication of the claims is entitled to deference under § 2254(d) (*id.* at 18–33).

1.  <u>Ramsey's Fourth Amendment Claim Regarding Suppression of the T-shirt is Not Reviewable on Federal Habeas.</u>

The *Stone v. Powell* doctrine provides:  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  428 U.S. at 494 (footnotes omitted).  The *Stone* Court found that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth

Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." *Id.* at 494–95 (footnote omitted).

"For a claim to be fully and fairly considered by the state courts, 'where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.'" *Tukes v. Dugger*, 911 F.2d 508, 513–14 (11th Cir. 1990) (quoting *Morgan v. Estelle*, 588 F.2d 934, 941 (5th Cir. 1979)).[4]  Where the state appellate court issues a summary affirmance of the trial court's decision on the Fourth Amendment issue, the trial court must have made explicit findings on matters essential to the Fourth Amendment issue in order to satisfy the requirement that the defendant have a full and fair opportunity to litigate the Fourth Amendment issue. *See Tukes*, 911 F.2d at 513–14 (holding that *Stone* did not foreclose review of the validity of a search where the trial court failed to make explicit findings on matters essential to the Fourth Amendment issue presented by defendant, and the state appellate court issued only a summary affirmance of the trial court's decision).

Upon review of the state court record in Ramsey's case, the undersigned concludes that consideration of the Fourth Amendment claim presented in Ground

---

[4] The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

One is foreclosed by *Stone v. Powell*. The record demonstrates that on March 25, 2015, defense counsel filed a motion to suppress a t-shirt collected from the backseat floor board of Officer French's patrol car, where Ramsey was detained (ECF No. 17-4 at 91–95 (motion to suppress)). The trial court held an evidentiary hearing on the motion to suppress on March 27, 2015 (ECF No. 17-5 (transcript of suppression hearing)). The parties had an opportunity to present evidence on the Fourth Amendment issue (*see id.*). The State presented testimony from Officer Curtis French and Investigator Jeremy Pelfrey (*id.* at 17–70). Defense counsel cross-examined the officers (*id.*). The trial court also questioned the officers and afforded counsel an opportunity to ask questions on the matters brought out during the court's questioning (*id.*). Ramsey testified on his own behalf (*id.* at 72–81). The court heard arguments from the State and defense counsel on the Fourth Amendment issue (*id.* at 81–102).

At the conclusion of the suppression hearing, the trial court made the following oral findings with respect to suppression of the t-shirt:

> First thing I'm going to find is that there is and was no illegal detention in this particular case. When applying the totality of the circumstances and specifically applying the factors that are set out in case law to the facts that have been testified here to [sic] today and taking all these things into consideration the officer was aware that there had been a home invasion robbery, gun involved, shots fired. There was a lone vehicle, he witnessed a lone vehicle traveling on the road in the direction reported by the victim. He testified that the vehicle was speeding. He also

testified that the vehicle gave an improper turn signal. The vehicle then stopped. And he testified that he witnessed one person fleeing from the vehicle. It was clear from the video that the doors were open on the vehicle. But with all that said I think it's important to note that there was no traffic stop made. This officer did not make a traffic stop. The vehicle stopped on its own and Mr. Ramsey approached the patrol car and that's when the detention occurred and we can see the blue lights come on at that point. He was at that time detained, he was placed in the back of a patrol car and approximately 15 minutes later is when Mr. Ramsey was seen lying to conceal this black shirt, that was shown here today, underneath the seat of the patrol car. So again when looking at all of those circumstances the court finds that there was no illegal detention.

(ECF No. 17-5 at 102–03 (transcript of suppression hearing)).

The trial court then issued a written order denying Ramsey's motion to suppress (ECF No. 17-4 at 97–99 (order)). The court adjudicated the Fourth Amendment issue as follows, in relevant part:

Defendant presents this Court with a Motion to Suppress which requests this court to find that the defendant was illegally detained, suppress all evidence that was obtained, suppress voice identification, suppress defendant's statement and dismiss all charges. Upon conducting an evidentiary bearing, and hearing argument from Counsel, the Court makes the following findings:

Shortly after Midnight on March 17, 2014, Officer Curtis French was advised by dispatch that a home invasion robbery involving a gun and shots fired had just occurred at a home on Garrett Road. The victim reported that the vehicle turned on Orange Hill Highway headed north. Shortly thereafter, Officer French witnessed a lone vehicle traveling northbound on Orange Hill Highway. The vehicle was speeding and Officer French turned around and began to follow the vehicle. The vehicle then used an improper turn signal. After turning onto Orange Street, the vehicle stopped and the officer witnessed one person fleeing from the vehicle. The doors of the vehicle were open and the defendant

began approaching the officer's patrol car. At that time, Officer French activated his blue lights. It is important to note that no traffic stop was conducted and the vehicle stopped on its own and the defendant approached Officer French. Officer French ordered the defendant to place his hands on the vehicle and conducted a pat down for weapons. He then secured the defendant in the back of his patrol car and called for backup and began to search for the individuals that fled on foot.

Approximately fifteen (15) minutes after this detention, the defendant is seen trying to conceal a black shirt in the patrol vehicle. Officer French retrieved the shirt from under the seat and gave it to another officer who collected the shirt and placed it into an evidence bag and concealed [sic] it.

Officers then interviewed the driver of the vehicle who gave them additional information, including telling them that she had driven the defendant and two other individuals to a location near the scene of the crime, dropped them off, and then picked them up shortly thereafter. She told officers that when the defendant got back in her car he hollered for her to, "Go, go, go."

Following the interview with the driver, the defendant was then placed under arrest.

Given these facts, and considering the totality of circumstances, the Court finds that the defendant was not illegally detained.

(ECF No. 17-4 at 97–98 (order)).

On direct appeal to the First DCA, Ramsey argued the trial court erred in denying the motion to suppress (ECF No. 17-11 (Ramsey's initial brief)). Ramsey argued Officer French detained him in violation of the Fourth Amendment, because there were no specific and articulable facts to support a well-founded or reasonable suspicion that Ramsey committed, was committing, or was about to commit a crime,

as required by *Terry v. Ohio*, 392 U.S. 1 (1968) and Florida state cases interpreting that decision (*id.* at 18–28). Ramsey argued that the black t-shirt collected from Officer French's patrol car was thus "fruit of the poisonous tree" and should have been suppressed, pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963) (*id.*). This was the same argument Ramsey presented to the trial court and the court adjudicated at the suppression hearing. The appellate record included the motion to suppress, a transcript of the evidentiary hearing, and the circuit court's written decision. The state appellate court summarily affirmed the trial court's ruling on the suppression issue. *Ramsey v. State*, 203 So. 3d 161 (Fla. 1st DCA 2016) (Table).

Ramsey was provided "full and fair" consideration of the Fourth Amendment issue in the state courts. Although the state appellate court issued only a summary affirmance, the trial court made explicit oral and written factual findings on matters essential to the Fourth Amendment issue, based upon the evidence adduced at the evidentiary hearing. Ramsey was thus provided consideration by the fact-finding court, and meaningful appellate review by a higher state court. Under *Stone v. Powell*, this federal court is precluded from considering the Fourth Amendment issue presented Ground One (i.e., whether evidence of the t-shirt was subject to suppression).

2.      <u>The State Court's Denial of Ramsey's Motion to Suppress His
Statement to Investigator Pelfrey is Entitled to Deference Under
§ 2254(d).</u>

Ramsey argues his statement to Investigator Pelfrey during Ramsey's

detention at the Jail was not freely and voluntarily given; therefore, it was subject to

suppression under the Fifth Amendment.

### a.      Clearly Established Federal Law

A defendant who is advised of his constitutional rights may waive them

"provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v.*

*Arizona*, 384 U.S. 436 444 (1966).  The inquiry has two distinct dimensions.  *See*

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "First, the relinquishment of the right

must have been voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception."  *Id.*; *see also Colorado v.*

*Connelly*, 479 U.S. 157, 167 (1986) (holding that coercive police activity is a

necessary predicate to a finding that a confession is not voluntary); *Blake v. State*,

972 So. 2d 839, 844 (Fla. 2007) (holding that a confession is involuntary only when

the circumstances show that coercive police activity overcame the defendant's free

will).  "Second, the waiver must have been made with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon

it." *Burbine*, 475 U.S. at 421.  Only if the "'totality of the circumstances surrounding

the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Baker v. State*, 71 So. 3d 802, 814 (Fla. 2011) (holding that Florida courts must apply a totality of the circumstances test to resolve whether a defendant's confession was voluntary).

The Supreme Court's seminal confession case was *Brown v. Mississippi*, 297 U.S. 278 (1936). In that case, police officers extracted confessions from the accused through brutal torture. The Court had little difficulty concluding that even though the Fifth Amendment did not at that time apply to the States, the actions of the police were "revolting to the sense of justice." *Id.* at 286.

After holding that the Fifth Amendment privilege against compulsory self-incrimination applied to the States, the Court still "retained this due process focus . . . ." *Connelly*, 479 U.S. at 163 (citations omitted). The *Connelly* Court recognized that in the fifty years since *Brown*, the Court's cases "focused upon the crucial element of police overreaching." *Id.; see also, e.g.*, *Blackburn v. Alabama*, 361 U.S. 199 (1960) (pre-*Miranda* case where police exploited defendant's history of mental illness with coercive tactics, including 8–9 hours of sustained interrogation in a tiny room which was upon occasion literally filled with police officers, the absence of

defendant's friends, relatives, or legal counsel, and the composition of the confession by a deputy rather than by defendant); *Mincey v. Arizona*, 437 U.S. 385 (1978) (defendant subjected to four-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); *Beecher v. Alabama*, 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina*, 384 U.S. 737 (1966) (sixteen days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Townsend v. Sain*, 372 U.S. 293 (1963) (confession obtained by officers who knew that police physician had given defendant a drug with truth-serum properties); *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 5 (1992); *Reck v. Pate*, 367 U.S. 433 (1961) (pre-*Miranda* case where defendant held for four days without adequate food or medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568 (1961) (pre-*Miranda* case where defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas*, 356 U.S. 560 (1958) (pre-*Miranda* case where defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Fikes v. State of Ala.*,

352 U.S. 191 (1957) (pre-*Miranda* case where defendant "of low mentality if not mentally ill" removed to state prison far from home and kept in isolation except for sessions of questioning lasting several hours at a time and prevented from seeing his lawyer until confession obtained); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (pre-*Miranda* case where defendant questioned by relays of officers for thirty-six hours without an opportunity for sleep).

The *Connelly* Court recognized:

> While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.[FN 2] Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. *See Spano v. New York*, 360 U.S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."
>
> > [FN 2: Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1424, 22 L. Ed. 2d 684 (1969).]

479 U.S. at 163–64. The Court concluded that the lack of police coercion in Connelly's case defeated his involuntary confession claim, even though Connelly

was mentally ill when he approached a police officer and confessed to a homicide after being advised of his *Miranda* rights.  *Id.* at 160–61, 167.

In *Michael C.*, the Court rejected the juvenile defendant's claims of coercion where the evidence showed the police took care to inform him of his rights and to ensure he understood them; the officers did not intimidate or threaten the defendant in any way; their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*; and although the police indicated that a cooperative attitude would be to the defendant's benefit, their remarks in this regard were far from threatening or coercive.  442 U.S. at 727.

### b.    Federal Review of State Court Decision

As the State concedes, Ramsey presented his Fifth Amendment claim in his motion to suppress and on direct appeal (ECF No. 17-4 at 91–95 (motion to suppress); ECF No. 17-11 at 29–33 (Ramsey's initial brief)).   In the motion to suppress, Ramsey argued his statement to Investigator Pelfrey at the Jail was not freely or voluntarily given because he was on "suicide watch" and under the effects of illegal drugs at the time he waived his rights and spoke to Investigator Pelfrey (ECF No. 17-4 at 94–95 (motion to suppress)).

At the suppression hearing, Ramsey testified he was booked into the Jail on March 17, 2014 (ECF No. 17-5 at 72 (transcript of suppression hearing)).  Ramsey

testified he had an illegal substance "Molly Ecstasy" in his possession when he was booked, but instead of surrendering it to officers, he ingested it (*id.* at 74–75). Ramsey testified he refused to speak with anyone at the Jail the day he was booked, but two days later, on March 19, he stopped Investigator Pelfrey as Pelfrey walked past his cell (*id.* at 72–73).  Ramsey testified he asked Investigator Pelfrey to "explain to me what is going on" (*id.* at 73).  Ramsey testified Pelfrey responded, "No, fill out a request because you had your chance to talk to me." (*id.*).  Ramsey testified he was on "suicide watch" and housed alone in a cell with only a smock to wear and no writing utensils (*id.* at 73–74).  Ramsey testified he asked Officer Duke to fill out a request form on his behalf, since he did not have a writing utensil (*id.* at 73).

Ramsey testified he was still under the influence of "Molly Ecstasy" and on suicide watch when he spoke to Investigator Pelfrey:

> Q [by defense counsel].  So at the time that you gave the statement to Investigator Pelfrey you would have still been on suicide watch, is that correct?
>
> A.  Yes, ma'am.
>
> Q.  And you told us that you were under the influence of some drugs at that point?
>
> A.  Yes, ma'am.

Q.  So did you, what, were you having any kind of issues as far as being able to remember or things of that nature?

A.  Yes, ma'am.

Q.  What kind of issues were you having?

A.  I was under duress, emotional distress for not knowing what is going on and why was I there and then at the same time when I, when I got into the office I was just under the impression that I was fixing [sic] to find out what was going on and it was Officer Pelfrey and it was another officer, I can't quite remember now, I think it was Officer Cook, but don't quote me on that, and he said that when I first got there he went to telling me, telling me we know what happened and they had a part of a statement that Ms. Thomas made, Trivia Thomas.  And they was like, oh, she already done told [sic] what happened so you better say yourself.  And so I did, I said, well, sir, I ain't do [sic] nothing so how I'm [sic] going to tell you something. He said, listen, Mr. Ramsey, I been [sic] doing this a long time so you ain't got [sic] to play no games with me.  And then he was like if you do cooperate here then it will be noted in the file for the judge to see and the state attorney to see that you cooperated and I can get you a better deal.

Q.  So is that one of the reasons that you gave the statements because he told you that?

A.  Yes, ma'am.

Q.  And were you able to think clearly and all at that point?

A.  No, not, no, ma'am.  I wasn't, it wasn't like I just deliberately and [sic] came out with the story.  It was pieced together because at the same time I was under the influence of drugs and I was trying to recall what happened to the, to my memory and so it was in bits and pieces of what happened.  And he sort of coerced me into saying things that I wasn't really trying to say at the time.

(ECF No. 17-5 76–77).   Ramsey testified he talked with someone with the Life Management Center either immediately before or immediately after he spoke to Investigator Pelfrey (*id.* at 77).   Ramsey testified the Life Management staff member only asked him if he felt like killing himself at the time (*id.* at 77–78).   Ramsey testified he did not feel he was able to provide Investigator Pelfrey with a fair and concise report of what happened (*id.* at 78).   Ramsey testified he remained on suicide watch for seven or eight days following his arrest (*id.* at 75–76).

On cross-examination, Ramsey reiterated that Investigator Pelfrey was not going to speak to him unless he (Ramsey) initiated the conversation by submitting a request (ECF No. 17-5 at 79).   Ramsey admitted Investigator Pelfrey advised him of his *Miranda* rights, and he (Ramsey) signed a form stating he understood his rights before he started answering questions about the crime (*id.* at 79–81).   The State asked Ramsey if he remembered telling Officer Church that he would rather die than go back to prison (*id.* at 78).   Ramsey responded, "I remember saying that I would rather die than not go back to prison.   I just told him I would rather die because they were falsely accusing me of something that I did." (*id.*).

Carla Brock testified she was the Jail administrator and records custodian for the Jail (ECF No. 17-5 at 7).   Ms. Brock testified she knew Ramsey as a Jail inmate (*id.* at 7–8).   Brock testified Ramsey was booked into the Jail on March 17, 2014, at

5:35 a.m. and placed on suicide precautions (*id.* at 8, 12–13). Brock testified Ramsey was placed on suicide precautions pursuant to an incident report prepared by Officer Dalton, the booking officer and officer in charge (OIC) (*id.* at 8). The incident report was admitted into evidence without objection (*id.* at 8–9). Ms. Brock read the incident report in open court:

> On 3-17-2014 at approximately 05:35 hours while assigned to the Washington County Jail as booking officer and OIC Deputy Casey Church did advise me that Brandon Ramsey stated to her that he would rather die than go to jail. Investigator Pelfrey also notified me that Inmate Ramsey asked him to kill him before he was brought to jail. Taking suicide precautions with the subject I stripped Inmate Ramsey down and placed him in a suicide smock in which he stated to me y'all are going to have to kill me like Trayvon Martin, I ain't [sic] getting in that shit. I explained to Inmate Ramsey that someone would evaluate him at a later time but due to his statement to Deputy Church and Investigator Pelfrey he would remain on suicide watch until further notice. Subject was placed on suicide observation in the medical cell unit until administrative evaluation. This incident happened at the Washington County Jail.

(ECF No. 17-5 at 9–10). Ms. Brock testified Jail policy dictated that if an inmate makes statements of that nature (i.e., that he would rather die than go back to prison), the inmate is placed on suicide precautions and Jail officials notify a nurse, who then notifies the Life Management Center (*id.* at 10–11).

Ms. Brock testified per policy, the Life Management Center sends someone to the Jail to evaluate the inmate and determine if the inmate should remain on suicide precautions (ECF No. 17-5 at 10–11). Ms. Brock testified that Jeff Stone, a

Life Management employee, evaluated Ramsey on March 18, 2014, at 8:55 a.m., and noted Ramsey was not suicidal and could return to the general population (*id.* at 11–13). Mr. Stone's evaluation was admitted into evidence without objection (*id.* at 11). Ms. Brock testified that, pursuant to Jail policy, Ramsey was maintained on a "step-up program" for seven days even though he was deemed non-suicidal and did not indicate additional suicidal statements or activity after his initial statements (*id.* at 11–12).

On cross-examination, defense counsel asked Ms. Brock if she talked to Ramsey after the Life Management evaluation (ECF No. 17-5 at 13). Brock responded:

> [H]e wanted to be moved to the back because he was not suicidal and he was, you know, wanting to go to the back, go to the back, and I explained to him what the policy was about the seven day wait and that he would be worked up. And I talked to him for quite awhile [sic] that day but he seemed to understand what the policy was and, you know, went along with it calmly.
>
> Q. Was he, did he seem to be emotional or upset or—
>
> A. No, not anything other than wanting to be off of suicide watch and being placed in the back.

(ECF No. 17-5 at 14). Brock explained what a "work-up" was:

> Well, daily the classification officer and medical staff will see him, you know, through the day and if he's not a problem, doesn't appear to have any other suicide tendencies during that precautionary time we give them an option, like I say the first day we will give them

an option, either they can have their uniform back or their tray or, you know, another item in which they are entitled to. If they do well with that item and they don't cause any problems, you know, throw their tray out, try to hurt themselves with anything we have given them back we will move it up to the next day they get something else. And that goes on and it takes about seven days, depending on their behavior.

(ECF No. 17-5 at 14–15). Ms. Brock testified officers completed confinement logs and observation records from March 17 to March 24, documenting Ramsey's behavior and attitude during that time (*id.* at 15–16). Brock testified that according to the records, "all of [Ramsey's] statuses and attitude were either calm or happy, good mood" (*id.* at 16).

Investigator Jeremy Pelfrey testified he first came into contact with Ramsey on March 17, 2014, when Ramsey was in the back of Officer French's patrol car (ECF No. 17-5 at 59). Pelfrey testified he asked Ramsey if he would be willing to go to the Sheriff's Office and speak with him, and Ramsey said yes (*id.*). Pelfrey testified that once he and Ramsey were at the Sheriff's Office, Ramsey refused to be interviewed (*id.* at 59–60).

Investigator Pelfrey testified on March 18, 2014, he received an inmate request that Ramsey wished to speak with him (ECF No. 17-5 at 52). Pelfrey testified he spoke with Ramsey the next day, on March 19, at 9:31 a.m. (*id.* at 52–53, 70). Investigator Pelfrey testified he advised Ramsey of his *Miranda* rights, and Ramsey appeared to understand them (*id.* at 53). Pelfrey testified he provided

Ramsey a "*Miranda* form," and Ramsey agreed to provide a statement and signed the form (*id.*).  Investigator Pelfrey testified Ramsey's statement was recorded (*id.*).

Investigator Jeremy Pelfrey testified he had worked as an investigator in the narcotics unit since 2011 (ECF No. 17-5 at 53–54).  He testified he had made "hundreds" of narcotics-related arrests (*id.* at 54).  Investigator Pelfrey testified that during his interview with Ramsey, Ramsey gave no indications he was under the influence of any kind of controlled substance, narcotics, alcohol, or any other mind-altering substance (*id.* at 55).  Pelfrey further testified that Ramsey did not appear to be having any kind of mental health issues (*id.* at 53).  Investigator Pelfrey testified Ramsey spoke in a coherent manner, seemed to understand Pelfrey's questions, and gave appropriate answers (*id.* at 55–56).  Pelfrey testified Ramsey did not have slurred speech or give any indication he was having a mental health problem or suffering from any kind of mental deficit (*id.* at 56).

On cross-examination, Investigator Pelfrey admitted he was not a mental health expert (ECF No. 17-5 at 56).  He testified he could not recall whether Ramsey was wearing a smock, which would have indicated he was on suicide precautions (*id.* at 66).  Investigator Pelfrey testified he was not aware if Ramsey had been tested for any drugs while in Jail (*id.*).

Defense counsel questioned Investigator Pelfrey about whether he offered Ramsey anything in return for giving a statement:

> Q.  Did you, I know it was recorded but did you offer him anything in return for giving the statement or anything of that nature?
>
> A.  No, I did not.
>
> Q.  Did you tell him that if he was cooperative that he could get a better deal or anything of that nature?
>
> A.  No, I did not.
>
> Q.  Put in a good word for him or anything of that nature?
>
> A.  No, I did not.  He mentioned that he would want to do this and try to help himself out and he would like to do five years.  That's what he said, if he could get off with five years he would take it.  But I did not offer him anything.
>
> Q.  Did you make any comment at all when he made that statement?
>
> A.  Talking about we will see what happens with the state.

(ECF No. 17-5 at 65–66).

At the conclusion of counsel's arguments, the trial court made the following oral findings:

> [A]s to the defendant's statement, yes, the evidence indicated that the defendant made some suicide threats.  He has also alleged here in court today that he ingested some drugs after he was taken to the jail.  However, the court notes that he was checked out by Life Management prior to his statement.  It was determined that he was not suicidal.  The jail captain testified that there was no suicidal behavior.  Also the

defendant requested the contact with Investigator Pelfrey. Investigator Pelfrey indicated that he responded appropriately to the questions that he asked him and the court notes that this statement was given 56 hours after the alleged crime. . . . And I take judicial notice that he was actually first appeared on March 18th, which would have been 24 hours, more than 24 hours before the statement was given. And at that time he watched a video regarding his rights, had an opportunity to speak with a public defender and knew what he had been charged with. I think whether or not his statement was freely or voluntarily made is for the, something that the jury can consider and I think there is a specific instruction on that for the jury as to whether or not they think he gave this statement freely and voluntarily.

(ECF No. 17-5 at 104–05). The trial court's written order included the same findings (ECF No. 17-4 at 98 (order denying motion to suppress)). Ramsey presented this issue to the First DCA on direct appeal (ECF No. 17-11 at 29–33 (Ramsey's initial brief)). As previously noted, the First DCA affirmed the judgment without written opinion.

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.* The state court need not cite or even be aware of Supreme Court precedents "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Ramsey has not presented clear and convincing evidence to rebut the state court's factual findings. Therefore, those factual findings are presumed correct, including, that a staff member from the Life Management Center evaluated Ramsey the day before Ramsey spoke to Pelfrey and determined he was not suicidal; Jail staff noted no suicidal behavior; Ramsey initiated contact with Investigator Pelfrey; and Pelfrey testified Ramsey acted appropriately while giving his statement.

The record of the suppression hearing includes additional, undisputed facts that support the court's denial of the motion to suppress. For example, there was no dispute that Ramsey provided his statement to Investigator Pelfrey more than 48 hours after he allegedly ingested "Molly Ecstasy" while being booked into the Jail. Additionally, not only did Jail staff note no suicidal behavior during Ramsey's placement on suicide precautions, but also staff described Ramsey during that time as calm, happy, and in a good mood.

Importantly, there was no dispute that Investigator Pelfrey advised Ramsey of his *Miranda* rights prior to Ramsey's providing a statement. According to the trial court's findings, this was the second time Ramsey was advised of his rights because he was also notified of his rights and the charges he was facing at his first appearance on March 18, 2014, the day before Ramsey spoke to Investigator Pelfrey (*see* ECF No. 17-4 at 17 (first appearance paperwork)). The first appearance paperwork,

signed by Ramsey and the attorney representing him at first appearance, included the following advisory:

> You are hereby informed that you have been arrested and a complaint has been made charging you with the below listed offenses and a copy of the charging document(s) is now provided to you. You have the right to remain silent, and if you do not remain silent anything you say can be used as evidence against you in Court. You have the right to be represented by a lawyer, and if you want one and cannot afford to hire one, a lawyer will be appointed for you at no cost to you.

(ECF No. 17-4 at 17). Ramsey was thus fully aware of both the nature of the rights he was abandoning and the consequences of his decision to abandon them.

Additionally, there are no facts suggesting the type of trickery, psychological pressure, or mistreatment required to meet the "police overreaching" requirement of involuntariness. Ramsey presented the state court with no evidence that Investigator Pelfrey engaged in physical or psychological pressure, improper interrogation tactics, deceit, or the like to elicit a statement from Ramsey.

Considering the totality of the circumstances, Ramsey has not demonstrated that the state court's adjudication of the Fifth Amendment claim asserted in Ground One was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of clearly established federal law. Therefore, Ramsey is not entitled to federal habeas relief on the Fifth Amendment claim asserted in Ground One.

**B.    Ground Two:   "Petitioner's Fifth, Six [sic], and Fourteenth Amendment rights to the United States Constitution was [sic] violated when trial counsel was ineffective for failure to depose and obtain petitioner's codefendant (Christopher Thomas) to testify on petitioner's behalf."**

Ramsey alleges that on February 8, 2015, prior to trial, he wrote defense counsel a letter requesting she subpoena co-defendant Christopher Thomas because Thomas wished to make a statement and would "unveil petitioner's role in the entire ordeal, more specifically, that petitioner was unaware a crime of that nature was about to occur" (ECF No. 10 at 13–14, 34–36).  Ramsey alleges Thomas also would have testified regarding Ramsey's location when the crime was in progress (*id.* at 14).   Ramsey alleges Thomas would have "take[n] full responsibility for his [Thomas'] role" (*id.*).  Ramsey alleges he repeated his request to counsel during a meeting and attempted to assist counsel with locating Thomas, who was incarcerated at the time of Ramsey's trial, but counsel failed to secure Thomas' appearance at trial (*id.*).  Ramsey states he presented this ineffective assistance of counsel (IAC) claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 13, 15).

The State concedes Ramsey exhausted this IAC claim by presenting it in his amended Rule 3.850 motion (ECF No. 17 at 13).  The State contends the state courts' adjudication of the claim is entitled to deference under § 2254(d) (*id.* at 37–38).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Strategic or tactical decisions, made after a thorough investigation of the law and facts, "are virtually unchallengeable" in an ineffective assistance claim.

*Strickland*, 466 U.S. at 690.  The Supreme Court has instructed that in reviewing claims of ineffective assistance the court must be mindful of the following:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high.  *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.    Federal Review of State Court Decision

Ramsey presented this IAC claim in Ground One of his amended Rule 3.850

motion, and he attached a copy of his letter to defense counsel, dated February 8,

2015 (approximately two months prior to Ramsey's trial) (ECF No. 17-26 at 16–19,

32–33).  In relevant part, the letter stated:

> I want you also Ms. Painter [defense counsel] to subpeona [sic] my co-
> defent [sic] Christopher Thomas for depose [sic] who is my witness and
> will advise you I didn't committ [sic] any crime nor any unlawful act
> againts [sic] the allege [sic] victim. . . . .  Mr. Christopher Thomas, my
> co-defendant wants to make a statement on my behalf that I didn't
> committ no [sic] crime.  So please subpeona [sic] him or make the
> necessary effort to contact him.  He's still here at the Washington
> County Jail or you still can make contact by phone at the correctional
> facility he's at.

(ECF No. 17-26 at 32–33).

The state circuit court adjudicated Ramsey's IAC claim as follows:

> The Defendant's grounds raise issues of ineffective assistance of
> counsel.  In order to succeed on a claim of ineffective assistance of
> counsel, a defendant must show that trial counsel's performance was
> deficient and that the deficient performance prejudiced the defendant
> so as to deprive the defendant of a fair trial.  *See Strickland v.*
> *Washington*, 466 U.S. 668, 687 (1984); *Hannon v. State*, 941 So. 2d
> 1109, 1118–1119 (Fla. 2006).  ln order to show deficient performance,
> a defendant must show that counsel's representation fell below an
> objective standard of reasonableness.  The proper measure of attorney
> performance is reasonableness under prevailing professional norms.
> *See Strickland*, *supra*, at 688.  In order to show prejudice, a defendant
> "must show that there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been
> different."  *Id.* at 694.  A reasonable probability is a probability

sufficient to undermine confidence in the outcome. Unless a defendant makes both showings, it cannot be said that the conviction and sentence resulted from a breakdown in the adversary process that renders the result unreliable. *See Spann v. State*, 985 So. 2d 1059 (Fla. 2008) (citing and quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The burden is on the defendant, not the State, to show a reasonable probability that the result would have been different. *See Everett v. State*, 54 So. 3d 464, 472 (Fla. 2010).

There is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 690. A fair assessment of attorney performance requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689 (emphasis added). The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91 , 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). An attorney's strategic decision does not constitute ineffective assistance if alternate courses of action have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct. *See State v. Barnes*, 24 So. 3d 1244, 1249 (Fla. 1st DCA 2009) (quoting *Chavez v. State*, 12 So. 3d 199, 207 (Fla. 2009)). "Judicial scrutiny of counsel's performance must be highly deferential." *See Hannon v. State*, 941 So. 2d 1109 (Fla. 2006). A defendant is not entitled to perfect or error-free counsel, only to reasonably effective counsel. *See Yarbrough v. State*, 871 So. 2d 1026, 1030 (Fla. 1st DCA 2004) (citing *Waterhouse v. State*, 522 So. 2d 341 (Fla. 1988)).

In **Ground 1**, Defendant alleges that counsel was ineffective for failing to depose and secure co-defendant (Christopher Thomas)[FN l] as a defense witness at trial, who would have offered testimony favorable to the defense.[FN 2]

[FN 1: *See* Washington Co. Case No. 14-81 CF, State v. Christopher Thomas. On January 22, 2015, Defendant Christopher Thomas entered a plea to Burglary of a

Dwelling and Robbery, both second degree felonies. Pursuant to plea agreement, Defendant Thomas was sentenced to serve 3 years DOC followed by 5 years of probation.]

[FN 2:  Defendant Brandon Ramsey elected not to testify at trial after inquiry by the Court.  *See* Trial Transcript Volume II held March 31, 2015 filed September 9, 2015 at pp. 226–228.]

The failure to call a witness can constitute ineffective assistance of counsel if the witness might be able to cast doubt on the defendant's guilt.  When a defendant claims ineffective assistance of counsel based on counsel's failure to investigate or call a specific witness, the defendant must allege that he or she advised counsel of the existence of such witness.  *See Blair v. State*, 17 So. 3d 1254 (Fla. 2nd DCA 2009); *see also Leonardi v. State*, 199 So. 3d 1075, 1076 (Fla. 5th DCA 2016) ("For a claim of ineffective assistance of counsel based on the failure to investigate and call a witness at trial, a defendant must allege and show the following:  (1) the identification of the witness; (2) the substance of the witness's testimony; and (3) a description of the prejudice suffered due to the lack of the testimony by the witness at trial.  *Tyler v. State*, 793 So.2d 137, 141 (Fla. 2nd DCA 2001) (citing *Odom v. State*, 770 So. 2d 195, 197 (Fla. 2nd DCA 2000)).  *See also Burroughs v. State*, 11 So. 3d 1000 (Fla. 1st DCA 2009).  Additionally, a facially sufficient postconviction motion alleging the ineffectiveness of counsel for failing to call a witness must also include an assertion that the witness would, in fact, have been available to testify at trial. *Nelson v. State*, 875 So. 2d 579, 584 (Fla. 2004).")

A defendant should not be held accountable for the refusal of a codefendant to testify.  Because no inference of guilt can be drawn against a defendant who declines to testify, none should be drawn as to the guilt of a codefendant.  *See Kaplow v. State*, 1 57 So. 2d 862 (Fla. 2nd DCA 1963).  On the other hand, a defendant cannot require a codefendant to waive his or her constitutional right to remain silent and force the codefendant to testify.  *See Engle v. State*, 438 So. 2d 803 (Fla.

1983); *see also* 24 Fla. Jur. 2d *Evidence and Witnesses* § 601 Refusal of codefendant to testify.

In the instant case, the victim, Travis Yarbrough, was at his home where he lives alone.  In the middle of night on March 17, 2014, when the victim was getting ready to go to bed, he was confronted by two men.  The victim ends up in a struggle with the two intruders.  At least one of the intruders is armed with a firearm because the victim seen [sic] the firearm and got his hands around the man holding the gun and is trying to desperately not get shot.  During the course of struggle, one of the men is yelling, "Get off my Brother", while hitting him in the head with the victim [sic] believes is another gun.  Then, another man, a third man, can be heard in the kitchen and he is asking the victim, "Where it at nigger?" in reference to drugs.  *See* Trial Transcript Volume I held March 31, 2015 filed September 9, 2015 at pp. 31–33.  All three voices sound familiar to the victim, the victim testified that when he heard the third voice, the person in the kitchen, he really recognized that voice because that person was a relative of his, a second cousin, the Defendant, Brandon Ramsey.  *See Id.* at pg. 34.

During the course of struggle, a shot goes off.  Thereafter, the three men, perpetrators, run from the house after they obtain cash and drugs that they took from the victim's residence.  The victim did not see their faces, but he recognized their voices.  The victim sees taillights from a vehicle heading back towards Chipley, Florida.  Subsequently, the victim places a call to 911.

Curtis French, with the Chipley Police Department was patrolling the area in the south part of the city when he hears the call come out over the radio.  So, the officer proceeds to the corner of South Boulevard and Orange Hill and he sees a car coming from direction [sic] that the 911 call came in.  Based upon his observations, the officer proceeds to follow this vehicle and obtain its license plate number so he can give it to Sheriff's office to help them with their investigation.  While the officer followed the vehicle, it stops and two people jump out of the car and start running away.  Further, the officer can see the Defendant, who is walking back from the white Crown Victoria toward the officer's car. Defendant is detained by the officer.  The other two

suspects, Christopher Thomas and Devante Thomas are later apprehended.

Later, Investigator Pelfrey with the Washington County Sheriff's office receives a request that the Defendant, Brandon Ramsey, would like to speak to him. So, he goes to talk to him at the jail, and a recorded statement given by the Defendant about this incident is played to the jury. In summary, Defendant Ramsey was in a gang with two other individuals, Devante and Christopher Thomas, that they were putting a hit on the victim. Defendant later clarifies that this was not a hit to kill, but it was a hit to collect money. It was intended to basically victim [sic] to pay up some money. Since the Defendant was the ranking gang member of the three, he went to oversee the hit. Defendant even stated in his statement that he went to the door of the victim's home after he heard that gunshot, which is consistent with the victim's testimony. Further, Defendant stated in his statement that he stayed out in the bushes most of the time, however, there is evidence that he did go inside the victim's home.

Further, Officer French and Corporal Duran Harrison found that the Defendant was kind of kicking a shirt underneath the front seat of the patrol car, wherein he was trying to conceal it from officers. Inside the victim's home, law enforcement found a sleeve of a shirt and then another piece of shirt that all match that same shirt that the Defendant was trying to conceal in the back of the patrol vehicle. DNA testimony was consistent with the Defendant's DNA found on the piece of the shirt that was in the victim's bedroom, which is near where the struggle had occurred in this case.

Although there was no direct evidence that the Defendant himself actually possessed a firearm, because the Defendant actively participated in the burglary and robbery, and he encouraged and helped the two co-defendant's [sic], Defendant was charged as a principal in this case by the State. According to the Defendant's statement, he was the ranking member of the gang, and he was supervising the hit. Therefore, if anybody could have called this off, it was the Defendant. Further, Defendant was one who made the arrangements with Trivia Thomas to get a ride out there to the victim's home. Brandon Ramsey

provided directions and told Trivia Thomas where to drop off them off on the side of a road and not in the front of the house in the middle of the night to get to the victim's home.  Thus, by the Defendant's own admission through his statement places himself with Trivia Thomas, Christopher Thomas, and Devante Thomas.[FN 3] who were in the car. Moreover, Defendant by his own statement, said that he participated in this crime.

> [FN 3:  *See* Washington Co. Case No. 14-79 CF, State v. Devante Thomas.  On December 22, 2014, Defendant Devante Thomas entered a plea to Burglary of a Dwelling and Robbery, both second degree felonies.  Pursuant to plea agreement, Defendant Thomas was sentenced to serve 36 months DOC followed by 5 years of probation.]

Therefore, out of abundance of caution, the Court directed a response from the State.  *See* Trial Transcript Volume I held March 31, 2015 filed September 9, 2015 at pp. 124–131.  *See Penton v. State*, 262 So. 3d 253 (Fla. 2nd DCA 201 8); *see also Rosa v. State*, 27 So. 3d 230 (Fla. 2nd DCA 2010).

Defendant alleges that counsel was ineffective for failing to depose and secure co-defendant Christopher Thomas as a defense witness at trial, who would have offered testimony favorable to defense. For all of the reasons set forth by the Court in the order directing this response, Ground 1 is due to be denied.  As the Court notes, Chris Thomas was a co-defendant that Defendant could not force to testify. Further, this issue was addressed on the record (TT beg. Pg. 126).  It is clear that Defendant had not spoken with Christopher Thomas and that Defendant was only speculating as to what Christopher Thomas might say but could not say what, if anything, Christopher Thomas would be willing to testify to.

Regardless, Defendant cannot demonstrate prejudice suffered by Defendant.  A piece of a shirt that Defendant was seen trying to hide in the patrol vehicle was found inside the victim's residence by the master bedroom.  The victim, who was related to Defendant, recognized Defendant's voice coming from the kitchen basically asking "where is

it at."  More importantly, Defendant's own statement left him without much of a defense.  (TT 185).  It was an admission to the crime. Defendant, by his own words, was the higher ranking gang member that oversaw a drug-related hit on the victim.  Defendant clarified that the "hit" wasn't a hit to kill, "it was a hit get back, pay up, give us our shit back" or in other words to rough up or scare the victim into paying back a drug-related debt.  (TT 198).  Defendant fails to accept that as the State explained, based on the definitions of a structure and a dwelling, by Defendant's own words, he sufficiently entered the residence to be guilty of burglary, regardless of whether he was in the bushes prior to the gun fire.  (TT 237–238).  Defendant gave the driver directions to the "hit."  (TT 210–211).

(ECF No. 17-30 at 18–21).

The First DCA affirmed the circuit court's order per curiam without written opinion.  *Ramsey v. State*, 303 So. 3d 521 (Fla. 1st DCA 2020) (Table).  As previously discussed, this court thus must "look through" the First DCA's unexplained decision to the state circuit court's decision, which provides a relevant rationale for the adjudication of Ramsey's IAC claim.

The state court's findings with respect to the evidence presented at Ramsey's trial are supported by the state court record.  The victim, Travis Yarbrough, testified he lived on Garret Road (ECF No. 17-8 at 25).  Mr. Yarbrough testified that at 1:30 a.m. on March 17, 2014, he heard a noise and saw "assailant number one" walking down the hallway of his home toward the master bedroom (*id.* at 25–29).  Yarbrough testified "assailant number one" was holding a handgun in his right hand pointed between Yarbrough's chest and neck (*id.* at 28).  Mr. Yarbrough testified he put up

his hands, walked a few steps toward "assailant number one," grabbed the gun, and pushed the assailant's right hand and the gun straight up into the air (*id.*). Mr. Yarbrough testified he and "assailant number one" struggled with the gun as they moved toward the bedroom, and a second assailant walked through the bedroom door and hit Yarbrough in his right temple (*id.* at 29). Mr. Yarbrough testified the second assailant struck him eight to ten times and repeatedly said, "Get off my brother" (*id.* at 30). Yarbrough testified during this time, he was still struggling with "assailant number one" for control of the handgun, and "assailant number one" said, "Shoot him in the legs, bro, shoot him in the legs." (*id.* at 31–32). Mr. Yarbrough testified the second assailant fired a shot, but it did not hit him (*id.* at 32–34). Yarbrough testified he could not visually recognize the assailants because it was dark, but the assailants' voices were familiar (*id.* at 33). Mr. Yarbrough testified "assailant number two" walked away and returned, and a third assailant appeared (*id.* at 35). Yarbrough testified the third assailant came into the kitchen/dining room area and said, "Where it at nigger?" (*id.* at 35, 52). Yarbrough testified he knew that the third assailant was referring to marijuana, and he recognized the third assailant's voice as his cousin's, Brandon Ramsey (*id.* at 35–36). Yarbrough testified he told Ramsey that the marijuana was above the oven (*id.* at 36–37). Mr. Yarbrough testified Ramsey and the other two assailants left (*id.* at 37). Yarbrough testified the

front door of his home and the window in his master bedroom were open after the assailants left, but they previously had been closed (*id.* at 44). Yarbrough testified the assailants took four ounces of marijuana in a box above the oven and approximately $2,000 and a handgun from the nightstand in his bedroom (*id.* at 39, 50–53). Mr. Yarbrough testified he later recognized the voice of the first assailant, who said "shoot him in the legs, bro" as Christopher Thomas' voice (*id.* at 58–60).

The jury also heard Trivia Thomas' testimony, that Ramsey came to her house, asked her to pick up her cousins Devante and Christopher Thomas, and rode with her to pick up Devante and Christopher (ECF No. 17-8 at 72–76). Trivia Thomas testified she dropped the three men off on the side of the road and returned to pick them up when Devante called and asked her to do so (*id.*).

In addition, the jury heard Ramsey's statements to Investigator Pelfrey, including that he was a ranking member of a gang that planned to scare Travis Yarbrough into paying money he owed (ECF No. 17-31 at 14–16, 24–26). Ramsey told Investigator Pelfrey that as a ranking gang member, he "had to oversee everything" (*id.* at 14). Ramsey stated he, Chris Thomas, and Devante Thomas got into Trivia Thomas' car, and Chris had a gun (*id.* at 16). Ramsey stated Trivia Thomas stopped in the middle of the road near Travis Yarbrough's house, and he, Chris, and Devante got out:

[Investigator Pelfrey]:   Did all three of y'all get out?

[Ramsey]:  I at first didn't, that's when I hesitate on getting out, I was going to leave, then I was like, man, fuck it, I just rather go to war with whoever come at me, but I got kids in Ft. Walton that's mine, and the shit really, like, originated from there, you know what I'm saying. So I was like, I got out.  If you ask Trivia when she picked us up, after I heard the gunshot go off, I was like, we all need to get out of here and I was in the bushes.  Ask Trivia she picked us up at two—she made two stops because I wasn't really trying to get them to call it off, I can't because you know what I'm saying.
. . . .

I stayed in the bushes, so I didn't really want to go in, I was just really like a [unintelligible] until I heard the shots . . . .

[Investigator Pelfrey]:   How long did you stay in the bushes while they were inside?

[Ramsey]:  Until I heard the shot and I picnicked [sic].

[Investigator Pelfrey]:   What did you do then, when you read [sic] the shot, what did you do?

[Ramsey]:  That's when I seen [sic] the front door open the first time, that's when I went to the door and I was like, man, something, something, come on now, y'all are tripping, man, y'all shooting and shit, you know what I'm saying.

[Investigator Pelfrey]:  Did you go into the house?

[Ramsey]:  I went to the door right there.

[Investigator Pelfrey]:  Did you go inside the house?

[Ramsey]:  Yes, sir, I came to the front door.

[Investigator Pelfrey]:  Okay, and did you go in to the front door and go into the house?

[Ramsey]:  No, sir, I ain't [sic] come out the front room, sir, right there at the entrance.

[Investigator Pelfrey]:  When you say "front room" did you go into the front room, did you walk through the front door?

[Ramsey]:  I stopped at the front door because they was coming my way.  That's when they—what-you-call-it, it had to Chris wresting [sic] him, that's when I noticed because he was still there.  He was like, "Let go.  Let me go."  That's when I was like, "man, y'all are tripping."  I was backing up then and Devante came out right then with me, Chris came out last.
. . . .

[Investigator Pelfrey]:  So, pretty much you watched them go inside the house and you sitting in the bushes and then you hear the gun fire.

[Ramsey]:  That's when I run up to the scene, "Y'all need to come on."  I ain't [sic] trying—

[Investigator Pelfrey]:  How many gunshots went off?

[Ramsey]:  One, I believe.

MALE SPEAKER 3:  Okay, but Chris was still tussling with Travis when you got there?

[Ramsey]:  Yeah, because when I came in, that's when he was like "Let go.  Let go."  It was something he was saying, that's when I really got [unintelligible].

MALE SPEAKER 3:  Were they on the floor or standing up?

[Ramsey]:  I didn't go all the way in, sir, that's what I'm telling you.
. . . .

I came in like right here, this the door I come in, like right here, that's when I met Devante coming, he was coming, you know what I'm saying because I seen [sic] the door opening, that's when I heard the shot, I'm like, dang.

[Investigator Pelfrey]: When you seen [sic] Devante, did he have a gun in his hand?

[Ramsey]: No, sir.

[Investigator Pelfrey]: Whenever you seen [sic] Chris coming out, running out, did he have a gun in his hand?

[Ramsey]: Chris had his hands in his hoodie running.

[Investigator Pelfrey]: Okay. Did Chris or Devante talk about any money?

[Ramsey]: All I know is something, you know I ain't [sic] going to lie, one of them say, let me think before—I don't want to put nothing [sic] on nobody, I want to keep it real, I think they said—it was something about two, they got some weed, about a pound or two pounds of weed.

(ECF No. 17-31 at 16–19, 21–22).

During a break in the trial proceedings, outside the presence of the jury, the court addressed Ramsey regarding his request for a *Nelson* hearing,[5] which Ramsey sent to the court and the prosecutor's office two weeks prior to trial (*see* ECF No.

---

[5] In Florida, if court-appointed counsel is alleged to be incompetent during trial level proceedings, a trial court must conduct a *Nelson* hearing to inquire into the effectiveness of counsel. *See Hardwick v. State*, 521 So. 2d 1071, 1074–75 (Fla. 1988) (approving the procedure provided in *Nelson v. State*, 274 So. 2d 256, 258–59 (Fla. 4th DCA 1973), for an inquiry with regard to a claim of alleged ineffective assistance of counsel).

17-8 at 127–28).  Ramsey stated that some of the issues he raised in the request had been addressed, but other issues had not, including that defense counsel did not have sufficient time to talk to potential defense witnesses, including Christopher Thomas, who was in custody in the state Department of Corrections (*id.* at 128).  The court asked Ramsey what Thomas would have told defense counsel if she had an opportunity to talk to him:

> THE COURT:  What do you believe Christopher Thomas would have told her [defense counsel] had she had an opportunity to talk with him?
>
> BRANDON TERRELL RAMSEY:  He was going to inform her about everything that to [sic] took place after we had a—they had a conversation with Mr. Yarbrough that they took upon themselves and went to his residence and I was in the woods, I didn't take part in none of that.  That was the part about the principal that we talked about.  As you will hear later on during trial, the context of hit and attention got took out [sic]—they took it and ran with it and put it in they own terminology and that was my fault because I shouldn't have been using street terminology, I should have took my time and spoke correctly.  He was going to let it be known that the hit certainly wasn't to do no killing, which it is in my statement, but it was to get attention.  They took the intention that night to harm, but it wasn't, it was to simply communicate with him and ask was he going to be able to pay what he owed before it come down on us
> . . . .
> THE COURT: What makes you believe he would have told her that?
>
> BRANDON TERRELL RAMSEY:  Because he knows the truth, sir.

(ECF No. 17-8 at 128–29).   Ramsey admitted he had not actually spoken with Christopher Thomas since the night of the burglary and robbery (*id.* at 129–30).

The state post-conviction court reasonably rejected Ramsey's IAC claim based upon defense counsel's failure to subpoena Christopher Thomas.  Ramsey's assertions as to what Thomas would have said on the witness stand were based on nothing but speculation.  Ramsey proffered no reliable evidence, for example, an affidavit or sworn declaration from Thomas, to support his assertions.  Further, Ramsey admitted he had not even spoken to Thomas since the night of the crimes. The state court thus reasonably concluded Ramsey failed to show a reasonable probability that his trial would have had a different outcome if defense counsel had subpoenaed Christopher Thomas, especially considering the evidence presented at trial (including Ramsey's admissions to Investigator Pelfrey about his involvement in planning and supervising the burglary) and the jury instructions on the principal theory of liability, which stated:

> If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did, if, number one, the defendant had a conscious intent that the criminal act be done.  Number two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime.

> To be a principal, the defendant does not have to be present when the crime is committed or attempted.

(ECF No. 17-9 at 115).

Ramsey has not demonstrated that the state court's adjudication of Ground Two was based upon an unreasonable determination of the facts, or that the court's adjudication was contrary to or an unreasonable application of *Strickland*.[6]  Ramsey is thus not entitled to federal habeas relief on Ground Two.

## C. Ground Three:  "Petitioner's Fifth, Six [sic], and Fourteenth Amendment rights to the United States Constitution was [sic] violated when trial counsel was ineffective for not requesting the 'Independent Act' theory of defense when it was clearly evidence [sic] presented at trial to support such a theory."

Ramsey alleges the primary defense theory he wished to present was "to clarify and diminish his position and role during the criminal offenses" (ECF No. 10 at 16–17, 37–38).   Ramsey alleges he asked defense counsel to request an "independent act" jury instruction, so the jury would have a "clear picture" of his

---

[6] It appears the state court misstated the nature of the charges to which Christopher Thomas pled. In the first footnote of the circuit court's order, the court noted that on January 22, 2015, Christopher Thomas entered a plea to Burglary of a Dwelling and Robbery, both **second** degree felonies.  The record demonstrates that on that date, Christopher entered a guilty plea to Burglary of a Dwelling **While Armed**, a **first** degree felony, and Robbery With No Firearm or Weapon, a second degree felony (*see* ECF No. 17-2 at 10–15).  This error does not undermine the basis of the state court's rejection of Ramsey's IAC claim, i.e., that Ramsey provided only speculative assertions that Christopher Thomas would have testified in his favor, and there was no reasonable probability the outcome of Ramsey's trial would have been different if defense counsel had subpoenaed Christopher Thomas.

involvement, if any, in the crimes as compared to his codefendants (*id.* at 16–17). Ramsey alleges he told law enforcement and defense counsel he was hiding in the bushes when his co-defendants committed the crimes (*id.*). Ramsey alleges the victim testified he never saw Ramsey in his home during commission of the offenses (*id.*). Ramsey asserts defense counsel's failure to acknowledge the available "independent act" defense was not sound strategy and "hurt the defense" (*id.* at 17). Ramsey states he presented this IAC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 16, 18).

The State concedes Ramsey exhausted this IAC claim by presenting it in his amended Rule 3.850 motion (ECF No. 17 at 13). The State contends the state courts' adjudication of the claim is entitled to deference under § 2254(d) (*id.* at 38–40).

### 1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this IAC claim.

### 2.    Federal Review of State Court Decision

Ransey presented this IAC claim as Ground Two of his amended Rule 3.850 motion (*see* ECF No. 17-26 at 20–23). The state circuit court adjudicated the claim as follows:

> In **Ground 2**, Defendant alleges that counsel was ineffective for failing to request the independent act jury instruction.

As a general rule, the felony-murder rule and the law of principals combine to make a felon liable for the acts of a cofelon. The independent act doctrine arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his or her cofelon which fall outside of, and are foreign to, the common design of the original collaboration.

Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act. The purpose of the independent-acts doctrine is to exonerate the nonparticipant from acts committed by a cofelon that are beyond the scope of the original plan. That is, an act in which a defendant does not participate and which is outside of and foreign to the common design of the original felonious collaboration may not be used to implicate the nonparticipant in the act. An independent act of a codefendant occurs when a person other than the defendant commits a crime (1) that the defendant did not intend to occur, (2) in which the defendant did not participate, and (3) that was outside of, and not a reasonably foreseeable consequence of, the common design or unlawful act contemplated by the defendant. A defendant's absence when a crime occurred does not establish, in and of itself, that the crime was an independent act of another. An act is said to be independent not only because it is committed by another person, but because it is independent of the common scheme or design to commit a felony.

Based upon the trial testimony, the Defendant was the ranking member of the gang, and he was supervising the hit upon his own family member. However, out of abundance of caution, the Court directed a response from the State. *See* 16 Fla. Jur 2d *Criminal Law-Substantive Principles/Offenses* § 93 Independent act doctrine as to liability for acts of cofelon, generally; 16 Fla. Jur 2d *Criminal Law-Substantive Principles/Offenses* § 94 Jury Instructions on Independent act doctrine as to liability for acts of cofelon; 16 Fla. Jur 2d *Criminal Law-Substantive Principles/Offenses* § 95 Jury Instructions on Independent Act doctrine as to liability for acts of cofelon-Particular Cases; 16 Fla. Jur 2d *Criminal Law-Substantive Principles/Offenses* § 555 Principals, aiders, and abettors-Independent Act.

Defendant claims counsel was ineffective for failing to request the independent act jury instruction. Again, for all of the reasons set forth by the Court in directing this response, Ground 2 of Defendant's motion is due to be denied. An independent act jury instruction is appropriate only when the actions of the cofelon who allegedly acted outside the scope of the original plan *were not forseeable* [sic] *based on the actions a defendant set in motion. Kitt v. State*, 260 So. 3d 462 (Fla. 1st DCA 2018); *see also Rodriguez v. State*, 147 So. 3d 1066 (Fla. 3d DCA 2014); *Diaz v. State*, 600 So. 2d 529 (Fla. 3d DCA 1992). Defendant, by his own words, oversaw or supervised lower ranking gang members in carrying out a "hit" to collect a drug-related debt in the middle of the night. According to Defendant, the victim was a drug dealer who owed drug money and knew they would be after him. The victim 6 foot [sic] 6 inches tall. (TT 25). The Defendant and co-Defendants were all gang members. Defendant and the victim were convicted felons. Entry into the victim's residence was through the bedroom window in the middle of the night. Defendant claimed that he was hiding in the bushes up until the gunfire. However, the victim recognized the third assailant's voice coming from the dining room to be that of his cousin, the Defendant, asking, "where it at nigger?," referring to the marijuana. (TT 33). Defendant was found hiding a shirt, a piece of which was found in the victim's residence near the master bedroom. The evidence in this case did not support an independent act jury instruction. Defendant cannot demonstrate error on the part of counsel or prejudice suffered by Defendant. Thus, Ground 2 is due to be denied.

(ECF No. 17-30 at 21–22). The First DCA affirmed the circuit court's decision without written opinion.

"It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (quoting

*Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).   Here, the state court determined that the evidence presented at Ramsey's trial did not support an independent act jury instruction.   Indeed, the evidence showed that Ramsey, Christopher Thomas, and Devante Thomas planned to enter Travis Yarbrough's home with the intent of assaulting and/or robbing Yarbrough of money and/or marijuana.  The evidence further showed that Ramsey supervised the "hit," arranged the transportation to Yarbrough's home, knew that Christopher was carrying a firearm when the three of them exited Trivia Thomas' car, and Ramsey eventually entered Yarbrough's home and demanded marijuana.   Even if Ramsey and the Thomas brothers may not have planned or discussed a physical struggle with Yarbrough or actual discharge of the firearm, both events were reasonably foreseeable.

Because the evidence did not support an independent act jury instruction, the state court reasonably concluded defense counsel was not deficient for failing to request one, and there was no reasonable probability the result of Ramsey's trial would have been different if counsel had requested the jury instruction.  Ramsey has not demonstrated that the state court's adjudication of Ground Three was based upon an unreasonable determination of fact, or contrary to or an unreasonable application of *Strickland*.  Therefore, Ramsey is not entitled to habeas relief on Ground Three.

**D.    Ground Four:    "Petitioner's Fifth, Six [sic], and Fourteenth Amendment rights to the United States Constitution was [sic] violated when trial counsel rendered ineffective assistance by failure to contemporaneously object to the giving of the "Principle" [sic] jury instruction with no one else charged with Armed Burglary and Robbery with a Firearm."**

Ramsey faults defense counsel for failing to object to the jury instruction on principal liability (ECF No. 10 at 19–20, 39–40).  Ramsey alleges prior to trial, his two co-defendants took plea deals for reduced charges of burglary and robbery without a firearm.  Ramsey alleges there was no direct evidence he personally possessed a firearm or was the "sole aggressor" in the crimes (*id.* at 20).  Further, the victim testified the first two assailants, whom he did not visually recognize, had firearms; but there was no evidence the third person, whose voice the victim recognized as Ramsey's, possessed a firearm (*id.*).  Ramsey alleges defense counsel should have objected to the jury instruction on principal liability on the ground that "no one else was charged with Armed Burglary and Robbery with a Firearm" at the time of Ramsey's trial  (*id.*).  Ramsey alleges defense counsel's failure to object to the principal instruction prejudiced him on direct appeal (*id.*).  Ramsey states he presented this IAC claim in his Rule 3.850 motion and his post-conviction appeal (*id.* at 21–22).

The State concedes Ramsey exhausted this IAC claim by presenting it in his amended Rule 3.850 motion (ECF No. 17 at 13). The State contends the state courts' adjudication of the claim is entitled to deference under § 2254(d) (*id.* at 41–42).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs Ramsey's IAC claim.

### 2.    Federal Review of State Court Decision

Ransey presented this IAC claim as Ground Three of his amended Rule 3.850 motion (*see* ECF No. 17-26 at 24–25). The state circuit court adjudicated the claim as follows:

> In **Ground 3**, Defendant alleges that counsel was ineffective for failing to object to the Court giving the principal jury instruction.[FN 4] *See* Trial Transcript Volume II held March 31, 2015, filed September 9, 2015 at pp. 229–230; 274–275 (the charge conference was held off the record).
>
> [FN 4: See Trial Transcript Volume II held March 31, 2015 filed September 9, 2015 at pp. 285 (principal instruction ready [sic] to the jury by the Court).]
>
> The law of principals instruction may be given if the evidence adduced at trial supports such an instruction, and if there is no evidence that would support the principals theory, then the reading of the instruction is error, and such an error is not harmless when it is capable of misleading the jury in such a way that the defendant's right to a fair trial is prejudiced. *See McGriff v. State*, 12 So. 3d 894 (Fla. 1st DCA 2009). Giving a jury instruction on the principals theory is error when there is no evidence that the defendant had a conscious intent that the crime be committed and did some act or said some word which was intended to and in fact did incite a third party to commit the crime with

which the defendant is charged. *See Hanks v. State*, 43 So. 3d 917 (Fla. 2nd DCA 2010). Mere presence at the scene of an offense is not sufficient to support a jury instruction on the principals theory. *See Hanks v. State*, 43 So. 3d 917 (Fla. 2nd DCA 2010).

However, Defendant's allegations failed to establish either prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Further, Defendant's allegations are conclusory in nature to warrant relief [sic]. *See Kennedy v. State*, 547 So. 2d 912 (Fla. 1989) ("A defendant may not simply file a motion for post conviction relief containing conclusory allegations that his or her trial [sic] was ineffective and then expect to receive an evidentiary hearing."). Although a trial court in its discretion may grant more than one opportunity to amend an insufficient claim, *Spera* does not mandate repeated opportunities. *See Nelson v. State*, 977 So. 2d 710 (Fla. 1st DCA 2008). Since the Defendant was either unable or unwilling to cure the deficiency, his insufficient claim is denied with prejudice. *See Id.*

Despite the foregoing, Defendant's claim is without merit. Defendant's own statement reflects that he was there to oversee the hit to get the victim, a family member, to pay up some money. The Defendant actively participated in the burglary and robbery and he knew about it and he had a conscious intent that the criminal act be done. Further, Defendant did some act or said some words which was intended to and did incite, cause, encourage, assist or advise the other co-defendants to actually commit the crime. Additionally, to be a principal, Defendant does not have to be present when the crime is committed or attempted. However, in the instant case, the evidence and testimony elicited from the Defendant's own statement reflect that he went into the threshold of the home and he participated in these crimes. Moreover, trial testimony reflects that Defendant was inside the victim's home and he made the arrangements with Trivia Thomas to get the ride out there in the middle of the night.

Defendant was charged by Second Amended Information filed January 26, 2015, and it contains the language in both counts that he did aid, abet, counsel, hire, otherwise procure, so the principal language was included in the information, on both counts. Defense counsel also

filed a Motion to Suppress on March 25, 2015, which requested that the Court suppress all evidence that was obtained, suppress voice identification, suppress defendant's statement and dismiss all charges. After an evidentiary hearing held March 27, 2015, the Court denied the Defendant's motion to suppress. *See* Order Denying Motion to Suppress filed March 27, 2015. Further, defense counsel presented argument in trial on behalf of the Defendant at the motion for judgment of acquittal which was denied by the Court. *See* Trial Transcript Volume II held March 31, 2015 filed September 9, 2015 at pp. 224–226.

Further, counsel is not ineffective for failing to file motions that have no merit. *See Magill v. State*, 457 So. 2d 1367 (Fla. 1984). While counsel may be ineffective for failing to investigate a valid defense, the defense in question must be viable. *See Panagiotakis v. State*, 619 So. 2d 345 (Fla. 2nd DCA 1993). Accordingly, counsel is not ineffective for failing to raise a meritless claim. *See Farina v. State*, 937 So. 2d 612, 619 n.5 (Fla. 2006) (quoting *Teffeteller v. Dugger*, 734 So. 2d 1009, 1023 (Fla. 1999) for the proposition that "Trial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding.")). Post conviction relief cannot be based on speculation or possibility. *See Maharaj v. State*, 778 So. 2d 944, 951 (Fla. 2000). The Defendant has failed to identify any evidence that would have produced a different result in the proceeding. Finally, a defendant is not entitled to perfect or error-free counsel, only to reasonably effective counsel. *See Yarbrough v. State*, 871 So. 2d 1026, 1030 (Fla. 1st DCA 2004) (citing *Waterhouse v. State*, 522 So. 2d 341 (Fla. 1988)).

(ECF No. 17-27 at 9–11). The First DCA affirmed the circuit court's decision without written opinion.

The state court already answered the question of what would have happened had defense counsel objected to the instruction on principals—the objection would have been overruled because there was sufficient evidence to support the instruction,

including the testimony of Travis Yarbrough and Trivia Thomas, and Ramsey's statements to Investigator Pelfrey. Further, Ramsey provided no legal authority for his assertion that a principal jury instruction was improper where co-felons are convicted, pursuant to guilty pleas, of lesser-included offenses on one or both of charges.

Defense counsel cannot be deemed ineffective for failing to make an objection that would have been overruled.

Moreover, Ramsey's assertion that trial counsel's failure to object to the principal instruction prejudiced the outcome of his appeal is wholly insufficient to satisfy *Strickland*. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (holding that when the claimed error of counsel occurred at the guilt stage of trial, *Strickland* prejudice is gauged against the outcome of trial, not on appeal) (citing *Strickland*, 466 U.S. at 694–95).

Ramsey has not demonstrated that the state court's adjudication of Ground Four was based upon an unreasonable determination of fact, or contrary to or an unreasonable application of *Strickland*. Therefore, Ramsey is not entitled to relief on Ground Four.

    **E.**    **Ground Five: "Petitioner's constitutional rights of the United States Constitution was [sic] violated from the 'cumulative effect' of errors that occurred pretrial and during trial and such errors made the entire process fundamentally unfair."**

Ramsey contends the trial court's error in denying the motion to suppress, and defense counsel's errors with respect to the jury instructions and the failure to subpoena Christopher Thomas, had the cumulative effect of denying him a fair trial (ECF No. 10 at 23, 42–43). Ramsey asserts he presented this "cumulative effect" claim to the state courts in his Rule 3.850 motion and the post-conviction appeal (*id.* at 23–24).

The State concedes Ramsey exhausted this claim by presenting it in his amended Rule 3.850 motion (ECF No. 17 at 13). The State contends there can be no "cumulative effect" because Ramsey has failed to establish any individual errors (*id.* at 42).

### 1. Clearly Established Federal Law

Under the cumulative error doctrine, an aggregation of otherwise nonreversible errors can warrant reversal where the combined effect of the errors denied the defendant his constitutional right to a fair trial. *United States v. Smith*, 928 F.3d 1215, 1233 (11th Cir. 2019) (citation omitted); *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (citing *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)). The federal court must first address the validity of each of the petitioner's claims individually and then examine any errors in the aggregate and in light of the trial as a whole. *See Insignares*, 755 F.3d

at 1284.  "[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic*, 466 U.S. 648, 659 n. 26 (1984).  Where there is no error or only a single error, the cumulative effect claim has no merit.  *See Smith*, 928 F.3d at 1233 (citation omitted); *Insignares*, 755 F.3d at 1284 (citation omitted).

## 2.    Federal Review of State Court Decision

Ramsey presented his cumulative effect claim as Ground Four in his amended Rule 3.850 motion (ECF No. 17-26 at 26).  The circuit court adjudicated the claim as follows:

> In **Ground 4**, Defendant alleges cumulative error.  However, the Court finds that the Defendant's ground is due to be denied.  *See Griffin v. State,* 866 So. 2d 1, 22 (Fla. 2003) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit.").

(ECF No. 17-30 at 23).  The First DCA affirmed without written opinion.

For the reasons discussed *supra*, this court has found no actual error with respect to any of Ramsey's claims.  In the absence of any actual error, Ramsey's "cumulative effect" claim is without merit.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El*, 537 U.S. at 336 (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    The amended petition for writ of habeas corpus (ECF No. 10) be **DENIED**.

2.    Petitioner's motion for evidentiary hearing (ECF NO. 25 at 5–8) be **DENIED**.

3.    A certificate of appealability be **DENIED**.

4.    The clerk be directed to enter judgment accordingly and close the case.

At Pensacola, Florida, this <u>15th</u> day of February 2022.

<u>/s/ *Elizabeth M. Timothy*   </u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**